UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | |
|---|---|
| THERON BAILEY, | ) |
|         Plaintiff, | ) |
| v. | ) No. 2:19-cv-00505-JRS-DLP |
| WEXFORD OF INDIANA, LLC, JACKIE WEST-DENNING, BARBARA RIGGS, | ) |
|         Defendants. | ) |

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Theron Bailey is suing a prison doctor, a prison nurse, and a prison medical provider under the Eighth Amendment for abruptly discontinuing his Neurontin prescription in November 2017. Mr. Bailey argues that his medical records prove the prescription was abruptly discontinued. But the medical records show the opposite—that he received Neurontin as prescribed throughout November 2017. A couple months later, the prescription was gradually discontinued when he developed new neurological symptoms, including unexplained falls, personality changes, and memory loss, that made sedating medications like Neurontin unsafe.

The prison doctor's decision to gradually discontinue Mr. Bailey's Neurontin prescription was a matter of professional judgment. The prison nurse was not involved in this decision, and the decision was not the result of the medical provider's express policies or widespread customs. Accordingly, the defendants' motion for summary judgment is **GRANTED**.

**I. SUMMARY JUDGMENT STANDARD**

Parties in a civil dispute may move for summary judgment, which is a way of resolving a case short of a trial. *See* Fed. R. Civ. P. 56(a). Summary judgment is appropriate when there is no genuine dispute as to any of the material facts, and the moving party is entitled to judgment as a

matter of law. *Id.*; *Pack v. Middlebury Cmty. Schs.*, 990 F.3d 1013, 1017 (7th Cir. 2021). A "genuine dispute" exists when a reasonable factfinder could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Material facts" are those that might affect the outcome of the suit. *Id.*

When reviewing a motion for summary judgment, the Court views the record and draws all reasonable inferences from it in the light most favorable to the nonmoving party. *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 572–73 (7th Cir. 2021). The Court is only required to consider the materials cited by the parties, *see* Fed. R. Civ. P. 56(c)(3); it is not required to "scour every inch of the record" for evidence that is potentially relevant. *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 573-74 (7th Cir. 2017).

## II. BACKGROUND

The Court exercises its discretion to consider only the materials cited by the parties in their summary judgment briefs. This evidence is viewed in the light most favorable to Mr. Bailey.

Dr. Samuel Byrd prescribed Neurontin for Mr. Bailey's nerve pain on October 16, 2017. Dkt. 58-2, pp. 333-34. Mr. Bailey received 600 mg of Neurontin twice a day from October 16 to November 20. *Id.* at 438, 440; dkt. 60, p. 4. On November 21, Dr. Byrd increased his dosage to 900 mg twice a day. Dkt. 58-2, pp. 326-27. Mr. Bailey received this dosage until January 9, 2018. *Id.* at 440; dkt. 60, pp. 2-4.[1]

Dr. West-Denning examined Mr. Bailey on January 2, 2018. Mr. Bailey reported a persistent headache, memory loss, nausea, and personality changes. He had fallen three times in the past week, seemed to be rambling more than usual, and could not button his clothes. Dr. West-

---

[1] Mr. Bailey occasionally missed a dose of Neurontin in the morning or the evening. Dkt. 58-2, p. 438; dkt. 60, pp. 1-3. Altogether, he received 161 of 172 doses of Neurontin from October 16, 2017 to January 9, 2018. *Id.*

2

Denning gradually discontinued his Neurontin prescription because she believed the medication could be disturbing his central nervous system. Dkt. 50-1, para. 5; dkt. 50-4, pp. 26-31.

Mr. Bailey received 300 mg of Neurontin twice a day from January 10 through January 16, and 300 mg of Neurontin once a day from January 17 to January 23. Dkt. 60, p. 2. He did not miss any of these prescribed doses. *Id.* After January 23, 2018, he stopped receiving Neurontin. *Id.*

He continued seeing Dr. West-Denning until June 2018. Dkt. 50-1, paras. 6-13. She treated his neurological symptoms, prescribed medications, ordered an EMG, and provided him with physical supports. *Id.* She did not resume his Neurontin prescription because she believed his neurological symptoms made sedating medications like Neurontin unsafe. *Id.* at para. 6.

### III. Discussion

Mr. Bailey is suing Dr. West-Denning and Nurse Riggs for abruptly discontinuing his Neurontin prescription. Dkt. 1 (complaint); dkt. 10 (screening order). He is also suing the prison's medical provider, Wexford of Indiana, LLC. *Id.* He alleges that the decision to abruptly discontinue his Neurontin prescription resulted from Wexford's policy or custom of denying necessary medications to save money. *Id.*

To prevail, Mr. Bailey must prove that he had an objectively serious medical condition and that the defendants were deliberately indifferent to that condition. *Petties v. Carter*, 836 F.3d 722, 727–28 (7th Cir. 2016) (en banc). The defendants do not contest that his neuropathy is objectively serious. The issue is whether the defendants were deliberately indifferent to this condition by abruptly discontinuing his Neurontin prescription.

#### A. Deliberate Indifference

"To infer deliberate indifference on the basis of a physician's treatment decision, the decision must be so far afield of accepted professional standards as to raise the inference that it

3

was not actually based on a medical judgment." *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006); *see also Plummer v. Wexford Health Sources, Inc.*, 609 F. App'x 861, 862 (7th Cir. 2015) (holding that defendant doctors were not deliberately indifferent because there was "no evidence suggesting that the defendants failed to exercise medical judgment or responded inappropriately to [the plaintiff's] ailments"). In addition, the Seventh Circuit has explained that "[a] medical professional is entitled to deference in treatment decisions unless no minimally competent professional would have [recommended the same] under those circumstances." *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014) (internal quotation omitted). "Disagreement between a prisoner and his doctor, or even between two medical professionals, about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation." *Id.*

### B. Analysis

Mr. Bailey's claims are based on a false premise. He believes his Neurontin prescription was abruptly discontinued—either by Dr. West-Denning or Nurse Riggs—in November 2017. Dkt. 58, p. 4, paras. 8-9. As a result of this abrupt withdrawal, he argues, he developed persistent neurological symptoms, including pain, numbness, and poor balance. *Id.* at p. 4, para. 15. He cites his November 2017 medication administration record for the proposition that his "Neurontin was discontinued without a valid reason or an examination. Bailey did not receive his Neurontin for the month of November." *See id.*, p. 4, para. 7 (citing dkt. 58-2, p. 440).[2]

But this is not an accurate description of the record. Mr. Bailey's medication administration record for November 2017 shows that he received 600 mg of Neurontin twice a day as Dr. Byrd prescribed. Dkt. 58-2, pp. 440; dkt. 60, p. 4. A couple months later, Dr. West-Denning gradually discontinued his Neurontin prescription because she believed the medication was unsafe after

---

[2] Mr. Bailey's citation is to "Ex. C, p. 432." The Exhibit C he submitted with his response brief contains his medical records. Page 432 of his medical records is his November 2017 medication administration record.

observing his new neurological symptoms, including a persistent headache, memory loss, nausea, personality changes, falls, rambling speech, and loss of fine motor coordination. Dkt. 50-1, para. 14; dkt. 50-4, pp. 26-31. Thus, her decision to gradually discontinue his Neurontin prescription was based on her professional judgment. Dkt. 50-1, para. 14. The Court defers to her professional judgment and concludes there is no evidence she was deliberately indifferent to Mr. Bailey's neuropathy. *See Pyles*, 771 F.3d at 409. Summary judgment for Dr. West-Denning is **GRANTED**.

Nurse Riggs was not personally involved in discontinuing Mr. Bailey's Neurontin prescription. *See Colbert v. City of Chi.*, 851 F.3d 649, 657 (7th Cir. 2017) ("Individual liability under § 1983 requires personal involvement in the alleged constitutional deprivation.") (cleaned up). As a nurse, she was not authorized to make diagnoses or order specific medical treatment. Dkt. 50-2, para. 5. Also, Mr. Bailey's assertion that "Nurse Riggs either discontinued the medication without approval or caused it to be discontinued by providing Dr. West-Denning with inaccurate information," dkt. 58, p. 4, para. 9, is not supported by a citation to admissible evidence. Accordingly, summary judgment for Nurse Riggs is **GRANTED**. [3]

To prevail against Wexford, Mr. Bailey must prove that he suffered constitutionally inadequate medical care because of a Wexford policy or widespread custom. *Jackson v. Ill. Medi-Car, Inc.*, 300 F.3d 760, 766 n.6 (7th Cir. 2002); *Estate of Moreland v. Dieter*, 395 F.3d 747, 758-59 (7th Cir. 2004). He argues that Wexford has a policy of denying essential medical care to save money. Dkt. 58, p. 8. In support of this argument, Mr. Bailey cites a Wexford publication that describes efforts to save costs on prescriptions. *Id.* (citing Dkt. 58-1, p. 182). This policy, known

---

[3] On December 29, 2017, Nurse Riggs had Mr. Bailey drug tested when she noticed his speech was slurred and his gait was staggered. *See* dkt. 58-2, pp. 313-14. Mr. Bailey argues this is evidence that Nurse Riggs intervened to have his Neurontin discontinued. Dkt. 58, pp. 5-6. This argument is unpersuasive. Mr. Bailey has not established a connection between his negative drug test and Dr. West-Denning's decision to discontinue his Neurontin prescription. The fact that he was drug tested and then gradually removed from Neurontin around the same time, without more, is not evidence of a causal connection.

as "Drug Utilization Review," ensures that prescriptions are "appropriate, *medically necessary*, and not likely to result in adverse medical results." Dkt. 58-1, p. 182 (emphasis added).

Although this policy does aim to save costs on prescriptions, the policy does not state that *medically necessary* prescriptions should be discontinued. To the contrary, the policy expressly states that prescriptions should be medically necessary, safe, and appropriate. Dr. West-Denning gradually discontinued Mr. Bailey's Neurontin prescription because she believed the medication was unsafe in light of his other neurological symptoms. Dkt. 50-1, para. 5; dkt. 50-4, pp. 26-31. There is no evidence the prescription was discontinued to save costs. Accordingly, summary judgment for Wexford is **GRANTED**.

## IV. CONCLUSION

The defendants' motion for summary judgment, dkt. [55], is **GRANTED**. Final judgment in accordance with this Order shall now issue.

**IT IS SO ORDERED**.

Date: 3/21/2022

*[signature]*

JAMES R. SWEENEY II, JUDGE
United States District Court
Southern District of Indiana

6

Distribution:

THERON BAILEY
981655
WABASH VALLEY - CF
WABASH VALLEY CORRECTIONAL FACILITY - Inmate Mail/Parcels
6908 S. Old US Hwy 41
P.O. Box 1111
CARLISLE, IN 47838

Douglass R. Bitner
KATZ  KORIN CUNNINGHAM, P.C.
dbitner@kkclegal.com

Sarah Jean Shores-Scisney
KATZ  KORIN CUNNINGHAM, P.C.
sshores@kkclegal.com